(Slip Opinion)　　　OCTOBER TERM, 2013　　　1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McCULLEN ET AL. *v.* COAKLEY, ATTORNEY GENERAL OF MASSACHUSETTS, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 12–1168.　Argued January 15, 2014—Decided June 26, 2014

In 2007, Massachusetts amended its Reproductive Health Care Facilities Act, which had been enacted in 2000 to address clashes between abortion opponents and advocates of abortion rights outside clinics where abortions were performed. The amended version of the Act makes it a crime to knowingly stand on a "public way or sidewalk" within 35 feet of an entrance or driveway to any "reproductive health care facility," defined as "a place, other than within or upon the grounds of a hospital, where abortions are offered or performed." Mass. Gen. Laws, ch. 266, §§120E½(a), (b). The Act exempts from this prohibition four classes of individuals, including "employees or agents of such facility acting within the scope of their employment." §120E½(b)(2). Another provision of the Act proscribes the knowing obstruction of access to an abortion clinic. §120E½(e).

　McCullen and the other petitioners are individuals who attempt to engage women approaching Massachusetts abortion clinics in "sidewalk counseling," which involves offering information about alternatives to abortion and help pursuing those options. They claim that the 35-foot buffer zones have displaced them from their previous positions outside the clinics, considerably hampering their counseling efforts. Their attempts to communicate with patients are further thwarted, they claim, by clinic "escorts," who accompany arriving patients through the buffer zones to the clinic entrances.

　Petitioners sued Attorney General Coakley and other Commonwealth officials, seeking to enjoin the Act's enforcement on the ground that it violates the First and Fourteenth Amendments, both on its face and as applied to them. The District Court denied both challenges, and the First Circuit affirmed. With regard to petition-

ers' facial challenge, the First Circuit held that the Act was a reasonable "time, place, and manner" regulation under the test set forth in *Ward* v. *Rock Against Racism*, 491 U. S. 781.

*Held*: The Massachusetts Act violates the First Amendment. Pp. 8–30.

(a) By its very terms, the Act restricts access to "public way[s]" and "sidewalk[s]," places that have traditionally been open for speech activities and that the Court has accordingly labeled "traditional public fora," *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 469. The government's ability to regulate speech in such locations is "very limited." *United States* v. *Grace*, 461 U. S. 171, 177. "[E]ven in a public forum," however, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information,'" *Ward, supra,* at 791. Pp. 8–10.

(b) Because the Act is neither content nor viewpoint based, it need not be analyzed under strict scrutiny. Pp. 10–18.

(1) The Act is not content based simply because it establishes buffer zones only at abortion clinics, as opposed to other kinds of facilities. First, the Act does not draw content-based distinctions on its face. Whether petitioners violate the Act "depends" not "on what they say," *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 27, but on where they say it. Second, even if a facially neutral law disproportionately affects speech on certain topics, it remains content neutral so long as it is "'justified without reference to the content of the regulated speech.'" *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 48. The Act's purposes include protecting public safety, patient access to healthcare, and unobstructed use of public sidewalks and streets. The Court has previously deemed all these concerns to be content neutral. See *Boos* v. *Barry*, 485 U. S. 312, 321. An intent to single out for regulation speech about abortion cannot be inferred from the Act's limited scope. "States adopt laws to address the problems that confront them." *Burson* v. *Freeman*, 504 U. S. 191, 207. There was a record of crowding, obstruction, and even violence outside Massachusetts abortion clinics but not at other kinds of facilities in the Commonwealth. Pp. 11–15.

(2) The Act's exemption for clinic employees and agents acting within the scope of their employment does not appear to be an attempt to favor one viewpoint about abortion over the other. *City of Ladue* v. *Gilleo*, 512 U. S. 43, 51, distinguished. Given that some kind of exemption was necessary to allow individuals who work at the clinics to enter or remain within the buffer zones, the "scope of

employment" qualification simply ensures that the exemption is limited to its purpose of allowing the employees to do their jobs. Even assuming that some clinic escorts have expressed their views on abortion inside the zones, the record does not suggest that such speech was within the scope of the escorts' employment. If it turned out that a particular clinic authorized its employees to speak about abortion in the buffer zones, that would support an as-applied challenge to the zones at that clinic. Pp. 15–18.

(c) Although the Act is content neutral, it is not "narrowly tailored" because it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U. S., at 799. Pp. 18–29.

(1) The buffer zones serve the Commonwealth's legitimate interests in maintaining public safety on streets and sidewalks and in preserving access to adjacent reproductive healthcare facilities. See *Schenck* v. *Pro-Choice Network of Western N. Y.*, 519 U. S. 357, 376. At the same time, however, they impose serious burdens on petitioners' speech, depriving them of their two primary methods of communicating with arriving patients: close, personal conversations and distribution of literature. Those forms of expression have historically been closely associated with the transmission of ideas. While the Act may allow petitioners to "protest" outside the buffer zones, petitioners are not protestors; they seek not merely to express their opposition to abortion, but to engage in personal, caring, consensual conversations with women about various alternatives. It is thus no answer to say that petitioners can still be seen and heard by women within the buffer zones. If all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message. Pp. 19–23.

(2) The buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests. Subsection (e) of the Act already prohibits deliberate obstruction of clinic entrances. Massachusetts could also enact legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994, 18 U. S. C. §248(a)(1), which imposes criminal and civil sanctions for obstructing, intimidating, or interfering with persons obtaining or providing reproductive health services. Obstruction of clinic driveways can readily be addressed through existing local traffic ordinances. While the Commonwealth contends that individuals can inadvertently obstruct access to clinics simply by gathering in large numbers, that problem could be addressed through a law requiring crowds blocking a clinic entrance to disperse for a limited period when ordered to do so by the police. In any event, crowding appears to be a problem only at the Boston clinic, and even there, only on Saturday mornings.

Syllabus

The Commonwealth has not shown that it seriously undertook to address these various problems with the less intrusive tools readily available to it. It identifies not a single prosecution or injunction against individuals outside abortion clinics since the 1990s. The Commonwealth responds that the problems are too widespread for individual prosecutions and injunctions to be effective. But again, the record indicates that the problems are limited principally to the Boston clinic on Saturday mornings, and the police there appear perfectly capable of singling out lawbreakers. The Commonwealth also claims that it would be difficult to prove intentional or deliberate obstruction or intimidation and that the buffer zones accordingly make the police's job easier. To meet the narrow tailoring requirement, however, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. In any event, to determine whether someone intends to block access to a clinic, a police officer need only order him to move; if he refuses, then there is no question that his continued conduct is knowing or intentional. For similar reasons, the Commonwealth's reliance on *Burson* v. *Freeman*, 504 U. S. 191, is misplaced. There, the Court upheld a law establishing buffer zones outside polling places on the ground that less restrictive measures were inadequate. But whereas "[v]oter intimidation and election fraud" are "difficult to detect," *id.,* at 208, obstruction and harassment at abortion clinics are anything but subtle. And while the police "generally are barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process," *id.,* at 207, they maintain a significant presence outside Massachusetts abortion clinics. In short, given the vital First Amendment interests at stake, it is not enough for Massachusetts simply to say that other approaches have not worked. Pp. 23–29.

708 F. 3d 1, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which KENNEDY and THOMAS, JJ., joined. ALITO, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
―――――――

No. 12–1168
―――――――

## ELEANOR McCULLEN, ET AL., PETITIONERS v. MARTHA COAKLEY, ATTORNEY GENERAL OF MASSACHUSETTS, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 26, 2014]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

A Massachusetts statute makes it a crime to knowingly stand on a "public way or sidewalk" within 35 feet of an entrance or driveway to any place, other than a hospital, where abortions are performed. Mass. Gen. Laws, ch. 266, §§120E½(a), (b) (West 2012). Petitioners are individuals who approach and talk to women outside such facilities, attempting to dissuade them from having abortions. The statute prevents petitioners from doing so near the facilities' entrances. The question presented is whether the statute violates the First Amendment.

## I

### A

In 2000, the Massachusetts Legislature enacted the Massachusetts Reproductive Health Care Facilities Act, Mass. Gen. Laws, ch. 266, §120E½ (West 2000). The law was designed to address clashes between abortion opponents and advocates of abortion rights that were occurring outside clinics where abortions were performed. The Act

established a defined area with an 18-foot radius around the entrances and driveways of such facilities. §120E½(b). Anyone could enter that area, but once within it, no one (other than certain exempt individuals) could knowingly approach within six feet of another person—unless that person consented—"for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." *Ibid.* A separate provision subjected to criminal punishment anyone who "knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility." §120E½(e).

The statute was modeled on a similar Colorado law that this Court had upheld in *Hill* v. *Colorado*, 530 U. S. 703 (2000). Relying on *Hill*, the United States Court of Appeals for the First Circuit sustained the Massachusetts statute against a First Amendment challenge. *McGuire* v. *Reilly*, 386 F. 3d 45 (2004) (*McGuire II*), cert. denied, 544 U. S. 974 (2005); *McGuire* v. *Reilly*, 260 F. 3d 36 (2001) (*McGuire I*).

By 2007, some Massachusetts legislators and law enforcement officials had come to regard the 2000 statute as inadequate. At legislative hearings, multiple witnesses recounted apparent violations of the law. Massachusetts Attorney General Martha Coakley, for example, testified that protestors violated the statute "on a routine basis." App. 78. To illustrate this claim, she played a video depicting protestors approaching patients and clinic staff within the buffer zones, ostensibly without the latter individuals' consent. Clinic employees and volunteers also testified that protestors congregated near the doors and in the driveways of the clinics, with the result that prospective patients occasionally retreated from the clinics rather than try to make their way to the clinic entrances or parking lots.

Captain William B. Evans of the Boston Police Depart-

ment, however, testified that his officers had made "no more than five or so arrests" at the Planned Parenthood clinic in Boston and that what few prosecutions had been brought were unsuccessful. *Id.,* at 68–69. Witnesses attributed the dearth of enforcement to the difficulty of policing the six-foot no-approach zones. Captain Evans testified that the 18-foot zones were so crowded with protestors that they resembled "a goalie's crease," making it hard to determine whether a protestor had deliberately approached a patient or, if so, whether the patient had consented. *Id.,* at 69–71. For similar reasons, Attorney General Coakley concluded that the six-foot no-approach zones were "unenforceable." *Id.,* at 79. What the police needed, she said, was a fixed buffer zone around clinics that protestors could not enter. *Id.,* at 74, 76. Captain Evans agreed, explaining that such a zone would "make our job so much easier." *Id.,* at 68.

To address these concerns, the Massachusetts Legislature amended the statute in 2007, replacing the six-foot no-approach zones (within the 18-foot area) with a 35-foot fixed buffer zone from which individuals are categorically excluded. The statute now provides:

> "No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway." Mass. Gen. Laws, ch. 266, §120E½(b) (West 2012).

A "reproductive health care facility," in turn, is defined as "a place, other than within or upon the grounds of a hospi-

tal, where abortions are offered or performed." §120E½(a).

The 35-foot buffer zone applies only "during a facility's business hours," and the area must be "clearly marked and posted." §120E½(c). In practice, facilities typically mark the zones with painted arcs and posted signs on adjacent sidewalks and streets. A first violation of the statute is punishable by a fine of up to $500, up to three months in prison, or both, while a subsequent offense is punishable by a fine of between $500 and $5,000, up to two and a half years in prison, or both. §120E½(d).

The Act exempts four classes of individuals: (1) "persons entering or leaving such facility"; (2) "employees or agents of such facility acting within the scope of their employment"; (3) "law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment"; and (4) "persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility." §120E½(b)(1)–(4). The legislature also retained the separate provision from the 2000 version that proscribes the knowing obstruction of access to a facility. §120E½(e).

## B

Some of the individuals who stand outside Massachusetts abortion clinics are fairly described as protestors, who express their moral or religious opposition to abortion through signs and chants or, in some cases, more aggressive methods such as face-to-face confrontation. Petitioners take a different tack. They attempt to engage women approaching the clinics in what they call "sidewalk counseling," which involves offering information about alternatives to abortion and help pursuing those options. Petitioner Eleanor McCullen, for instance, will typically initiate a conversation this way: "Good morning, may I give you my literature? Is there anything I can do for you?

I'm available if you have any questions." App. 138. If the woman seems receptive, McCullen will provide additional information. McCullen and the other petitioners consider it essential to maintain a caring demeanor, a calm tone of voice, and direct eye contact during these exchanges. Such interactions, petitioners believe, are a much more effective means of dissuading women from having abortions than confrontational methods such as shouting or brandishing signs, which in petitioners' view tend only to antagonize their intended audience. In unrefuted testimony, petitioners say they have collectively persuaded hundreds of women to forgo abortions.

The buffer zones have displaced petitioners from their previous positions outside the clinics. McCullen offers counseling outside a Planned Parenthood clinic in Boston, as do petitioners Jean Zarrella and Eric Cadin. Petitioner Gregory Smith prays the rosary there. The clinic occupies its own building on a street corner. Its main door is recessed into an open foyer, approximately 12 feet back from the public sidewalk. Before the Act was amended to create the buffer zones, petitioners stood near the entryway to the foyer. Now a buffer zone—marked by a painted arc and a sign—surrounds the entrance. This zone extends 23 feet down the sidewalk in one direction, 26 feet in the other, and outward just one foot short of the curb. The clinic's entrance adds another seven feet to the width of the zone. *Id.,* at 293–295. The upshot is that petitioners are effectively excluded from a 56-foot-wide expanse of the public sidewalk in front of the clinic.[1]

Petitioners Mark Bashour and Nancy Clark offer counseling and information outside a Planned Parenthood clinic in Worcester. Unlike the Boston clinic, the Worces-

——————

[1] The zone could have extended an additional 21 feet in width under the Act. Only the smaller area was marked off, however, so only that area has legal effect. See Mass. Gen. Laws, ch. 266, §120E½(c).

ter clinic sits well back from the public street and sidewalks. Patients enter the clinic in one of two ways. Those arriving on foot turn off the public sidewalk and walk down a nearly 54-foot-long private walkway to the main entrance. More than 85% of patients, however, arrive by car, turning onto the clinic's driveway from the street, parking in a private lot, and walking to the main entrance on a private walkway.

Bashour and Clark would like to stand where the private walkway or driveway intersects the sidewalk and offer leaflets to patients as they walk or drive by. But a painted arc extends from the private walkway 35 feet down the sidewalk in either direction and outward nearly to the curb on the opposite side of the street. Another arc surrounds the driveway's entrance, covering more than 93 feet of the sidewalk (including the width of the driveway) and extending across the street and nearly six feet onto the sidewalk on the opposite side. *Id.,* at 295–297. Bashour and Clark must now stand either some distance down the sidewalk from the private walkway and driveway or across the street.

Petitioner Cyril Shea stands outside a Planned Parenthood clinic in Springfield, which, like the Worcester clinic, is set back from the public streets. Approximately 90% of patients arrive by car and park in the private lots surrounding the clinic. Shea used to position himself at an entrance to one of the five driveways leading to the parking lots. Painted arcs now surround the entrances, each spanning approximately 100 feet of the sidewalk parallel to the street (again, including the width of the driveways) and extending outward well into the street. *Id.,* at 297–299. Like petitioners at the Worcester clinic, Shea now stands far down the sidewalk from the driveway entrances.

Petitioners at all three clinics claim that the buffer zones have considerably hampered their counseling ef-

forts. Although they have managed to conduct some counseling and to distribute some literature outside the buffer zones—particularly at the Boston clinic—they say they have had many fewer conversations and distributed many fewer leaflets since the zones went into effect. *Id.,* at 136–137, 180, 200.

The second statutory exemption allows clinic employees and agents acting within the scope of their employment to enter the buffer zones. Relying on this exemption, the Boston clinic uses "escorts" to greet women as they approach the clinic, accompanying them through the zones to the clinic entrance. Petitioners claim that the escorts sometimes thwart petitioners' attempts to communicate with patients by blocking petitioners from handing literature to patients, telling patients not to "pay any attention" or "listen to" petitioners, and disparaging petitioners as "crazy." *Id.,* at 165, 178.

C

In January 2008, petitioners sued Attorney General Coakley and other Commonwealth officials. They sought to enjoin enforcement of the Act, alleging that it violates the First and Fourteenth Amendments, both on its face and as applied to them. The District Court denied petitioners' facial challenge after a bench trial based on a stipulated record. 573 F. Supp. 2d 382 (Mass. 2008).

The Court of Appeals for the First Circuit affirmed. 571 F. 3d 167 (2009). Relying extensively on its previous decisions upholding the 2000 version of the Act, see *McGuire II*, 386 F. 3d 45; *McGuire I*, 260 F. 3d 36, the court upheld the 2007 version as a reasonable "time, place, and manner" regulation under the test set forth in *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989). 571 F. 3d, at 174–181. It also rejected petitioners' arguments that the Act was substantially overbroad, void for vagueness, and an impermissible prior restraint. *Id.,* at 181–184.

The case then returned to the District Court, which held that the First Circuit's decision foreclosed all but one of petitioners' as-applied challenges. 759 F. Supp. 2d 133 (2010). After another bench trial, it denied the remaining as-applied challenge, finding that the Act left petitioners ample alternative channels of communication. 844 F. Supp. 2d 206 (2012). The Court of Appeals once again affirmed. 708 F. 3d 1 (2013).

We granted certiorari. 570 U. S. ___ (2013).

## II

By its very terms, the Massachusetts Act regulates access to "public way[s]" and "sidewalk[s]." Mass. Gen. Laws, ch. 266, §120E½(b) (Supp. 2007). Such areas occupy a "special position in terms of First Amendment protection" because of their historic role as sites for discussion and debate. *United States* v. *Grace*, 461 U. S. 171, 180 (1983). These places—which we have labeled "traditional public fora"—"'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 469 (2009) (quoting *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983)).

It is no accident that public streets and sidewalks have developed as venues for the exchange of ideas. Even today, they remain one of the few places where a speaker can be confident that he is not simply preaching to the choir. With respect to other means of communication, an individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site. Not so on public streets and sidewalks. There, a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose "to preserve an uninhibited marketplace of ideas in which truth

will ultimately prevail," *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 377 (1984) (internal quotation marks omitted), this aspect of traditional public fora is a virtue, not a vice.

In short, traditional public fora are areas that have historically been open to the public for speech activities. Thus, even though the Act says nothing about speech on its face, there is no doubt—and respondents do not dispute—that it restricts access to traditional public fora and is therefore subject to First Amendment scrutiny. See Brief for Respondents 26 (although "[b]y its terms, the Act regulates only conduct," it "incidentally regulates the place and time of protected speech").

Consistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is "very limited." *Grace*, *supra*, at 177. In particular, the guiding First Amendment principle that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content" applies with full force in a traditional public forum. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). As a general rule, in such a forum the government may not "selectively . . . shield the public from some kinds of speech on the ground that they are more offensive than others." *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 209 (1975).

We have, however, afforded the government somewhat wider leeway to regulate features of speech unrelated to its content. "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward*, 491 U. S., at 791 (quoting *Clark* v.

*Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984)).[2]

While the parties agree that this test supplies the proper framework for assessing the constitutionality of the Massachusetts Act, they disagree about whether the Act satisfies the test's three requirements.

## III

Petitioners contend that the Act is not content neutral for two independent reasons: First, they argue that it discriminates against abortion-related speech because it establishes buffer zones only at clinics that perform abortions. Second, petitioners contend that the Act, by exempting clinic employees and agents, favors one viewpoint about abortion over the other. If either of these arguments is correct, then the Act must satisfy strict scrutiny—that is, it must be the least restrictive means of achieving a compelling state interest. See *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000). Respondents do not argue that the Act can survive this exacting standard.

JUSTICE SCALIA objects to our decision to consider whether the statute is content based and thus subject to strict scrutiny, given that we ultimately conclude that it is not narrowly tailored. *Post*, at 2 (opinion concurring in judgment). But we think it unexceptional to perform the first part of a multipart constitutional analysis first. The content-neutrality prong of the *Ward* test is logically antecedent to the narrow-tailoring prong, because it determines the appropriate level of scrutiny. It is not unusual for the Court to proceed sequentially in applying a

———————

[2] A different analysis would of course be required if the government property at issue were not a traditional public forum but instead "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 470 (2009).

constitutional test, even when the preliminary steps turn out not to be dispositive. See, *e.g., Bartnicki* v. *Vopper*, 532 U. S. 514, 526–527 (2001); *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 25–28 (2010) (concluding that a law was content based even though it ultimately survived strict scrutiny).

The Court does sometimes assume, without deciding, that a law is subject to a less stringent level of scrutiny, as we did earlier this Term in *McCutcheon* v. *Federal Election Commission*, 572 U. S. ___, ___ (2014) (plurality opinion) (slip op., at 10). But the distinction between that case and this one seems clear: Applying any standard of review other than intermediate scrutiny in *McCutcheon*—the standard that was assumed to apply—would have required overruling a precedent. There is no similar reason to forgo the ordinary order of operations in this case.

At the same time, there is good reason to address content neutrality. In discussing whether the Act is narrowly tailored, see Part IV, *infra*, we identify a number of less-restrictive alternative measures that the Massachusetts Legislature might have adopted. Some apply only at abortion clinics, which raises the question whether those provisions are content neutral. See *infra*, at 12–15. While we need not (and do not) endorse any of those measures, it would be odd to consider them as possible alternatives if they were presumptively unconstitutional because they were content based and thus subject to strict scrutiny.

A

The Act applies only at a "reproductive health care facility," defined as "a place, other than within or upon the grounds of a hospital, where abortions are offered or performed." Mass. Gen. Laws, ch. 266, §120E½(a). Given this definition, petitioners argue, "virtually all speech affected by the Act is speech concerning abortion," thus rendering the Act content based. Brief for Petitioners 23.

We disagree. To begin, the Act does not draw content-based distinctions on its face. Contrast *Boos* v. *Barry*, 485 U. S. 312, 315 (1988) (ordinance prohibiting the display within 500 feet of a foreign embassy of any sign that tends to bring the foreign government into "'public odium'" or "'public disrepute'"); *Carey* v. *Brown*, 447 U. S. 455, 465 (1980) (statute prohibiting all residential picketing except "peaceful labor picketing"). The Act would be content based if it required "enforcement authorities" to "examine the content of the message that is conveyed to determine whether" a violation has occurred. *League of Women Voters of Cal.*, *supra*, at 383. But it does not. Whether petitioners violate the Act "depends" not "on what they say," *Humanitarian Law Project*, *supra*, at 27, but simply on where they say it. Indeed, petitioners can violate the Act merely by standing in a buffer zone, without displaying a sign or uttering a word.

It is true, of course, that by limiting the buffer zones to abortion clinics, the Act has the "inevitable effect" of restricting abortion-related speech more than speech on other subjects. Brief for Petitioners 24 (quoting *United States* v. *O'Brien*, 391 U. S. 367, 384 (1968)). But a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics. On the contrary, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, *supra*, at 791. The question in such a case is whether the law is "'justified without reference to the content of the regulated speech.'" *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 48 (1986) (quoting *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976); emphasis deleted).

The Massachusetts Act is. Its stated purpose is to "increase forthwith public safety at reproductive health care

facilities." 2007 Mass. Acts p. 660. Respondents have articulated similar purposes before this Court—namely, "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways." Brief for Respondents 27; see, *e.g.,* App. 51 (testimony of Attorney General Coakley); *id.,* at 67–70 (testimony of Captain William B. Evans of the Boston Police); *id.,* at 79–80 (testimony of Mary Beth Heffernan, Undersecretary for Criminal Justice); *id.,* at 122–124 (affidavit of Captain Evans). It is not the case that "[e]very objective indication shows that the provision's primary purpose is to restrict speech that opposes abortion." *Post*, at 7.

We have previously deemed the foregoing concerns to be content neutral. See *Boos*, 485 U. S., at 321 (identifying "congestion," "interference with ingress or egress," and "the need to protect . . . security" as content-neutral concerns). Obstructed access and congested sidewalks are problems no matter what caused them. A group of individuals can obstruct clinic access and clog sidewalks just as much when they loiter as when they protest abortion or counsel patients.

To be clear, the Act would not be content neutral if it were concerned with undesirable effects that arise from "the direct impact of speech on its audience" or "[l]isteners' reactions to speech." *Ibid.* If, for example, the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech. All of the problems identified by the Commonwealth here, however, arise irrespective of any listener's reactions. Whether or not a single person reacts to abortion protestors' chants or petitioners' counseling, large crowds outside abortion clinics can still compromise public safety, impede access, and obstruct sidewalks.

Petitioners do not really dispute that the Common-

wealth's interests in ensuring safety and preventing ob-
struction are, as a general matter, content neutral. But
petitioners note that these interests "apply outside every
building in the State that hosts any activity that might
occasion protest or comment," not just abortion clinics.
Brief for Petitioners 24. By choosing to pursue these
interests only at abortion clinics, petitioners argue, the
Massachusetts Legislature evinced a purpose to "single[ ]
out for regulation speech about one particular topic: abor-
tion." Reply Brief 9.

We cannot infer such a purpose from the Act's limited
scope. The broad reach of a statute can help confirm that
it was not enacted to burden a narrower category of disfa-
vored speech. See Kagan, Private Speech, Public Purpose:
The Role of Governmental Motive in First Amendment
Doctrine, 63 U. Chi. L. Rev. 413, 451–452 (1996). At the
same time, however, "States adopt laws to address the
problems that confront them. The First Amendment does
not require States to regulate for problems that do not
exist." *Burson* v. *Freeman*, 504 U. S. 191, 207 (1992)
(plurality opinion). The Massachusetts Legislature
amended the Act in 2007 in response to a problem that
was, in its experience, limited to abortion clinics. There
was a record of crowding, obstruction, and even violence
outside such clinics. There were apparently no similar
recurring problems associated with other kinds of
healthcare facilities, let alone with "every building in the
State that hosts any activity that might occasion protest
or comment." Brief for Petitioners 24. In light of the
limited nature of the problem, it was reasonable for the
Massachusetts Legislature to enact a limited solution.
When selecting among various options for combating a
particular problem, legislatures should be encouraged to
choose the one that restricts less speech, not more.

JUSTICE SCALIA objects that the statute does restrict
more speech than necessary, because "only one [Massa-

chusetts abortion clinic] is known to have been beset by the problems that the statute supposedly addresses." *Post*, at 7. But there are no grounds for inferring content-based discrimination here simply because the legislature acted with respect to abortion facilities generally rather than proceeding on a facility-by-facility basis. On these facts, the poor fit noted by JUSTICE SCALIA goes to the question of narrow tailoring, which we consider below. See *infra,* at 26–28.

## B

Petitioners also argue that the Act is content based because it exempts four classes of individuals, Mass. Gen. Laws, ch. 266, §§120E½(b)(1)–(4), one of which comprises "employees or agents of [a reproductive healthcare] facility acting within the scope of their employment." §120E½(b)(2). This exemption, petitioners say, favors one side in the abortion debate and thus constitutes viewpoint discrimination—an "egregious form of content discrimination," *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). In particular, petitioners argue that the exemption allows clinic employees and agents—including the volunteers who "escort" patients arriving at the Boston clinic—to speak inside the buffer zones.

It is of course true that "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *City of Ladue* v. *Gilleo*, 512 U. S. 43, 51 (1994) (quoting *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 785–786 (1978)). At least on the record before us, however, the statutory exemption for clinic employees and agents acting within the scope of their employment does not appear to be such an attempt.

There is nothing inherently suspect about providing some kind of exemption to allow individuals who work at

the clinics to enter or remain within the buffer zones. In particular, the exemption cannot be regarded as simply a carve-out for the clinic escorts; it also covers employees such as the maintenance worker shoveling a snowy sidewalk or the security guard patrolling a clinic entrance, see App. 95 (affidavit of Michael T. Baniukiewicz).

Given the need for an exemption for clinic employees, the "scope of their employment" qualification simply ensures that the exemption is limited to its purpose of allowing the employees to do their jobs. It performs the same function as the identical "scope of their employment" restriction on the exemption for "law enforcement, ambulance, fire-fighting, construction, utilities, public works and other municipal agents." §120E½(b)(3). Contrary to the suggestion of JUSTICE SCALIA, *post*, at 11–12, there is little reason to suppose that the Massachusetts Legislature intended to incorporate a common law doctrine developed for determining vicarious liability in tort when it used the phrase "scope of their employment" for the wholly different purpose of defining the scope of an exemption to a criminal statute. The limitation instead makes clear— with respect to both clinic employees and municipal agents—that exempted individuals are allowed inside the zones only to perform those acts authorized by their employers. There is no suggestion in the record that any of the clinics authorize their employees to speak about abortion in the buffer zones. The "scope of their employment" limitation thus seems designed to protect against exactly the sort of conduct that petitioners and JUSTICE SCALIA fear.

Petitioners did testify in this litigation about instances in which escorts at the Boston clinic had expressed views about abortion to the women they were accompanying, thwarted petitioners' attempts to speak and hand literature to the women, and disparaged petitioners in various ways. See App. 165, 168–169, 177–178, 189–190. It is

unclear from petitioners' testimony whether these alleged incidents occurred within the buffer zones. There is no viewpoint discrimination problem if the incidents occurred outside the zones because petitioners are equally free to say whatever they would like in that area.

Even assuming the incidents occurred inside the zones, the record does not suggest that they involved speech within the scope of the escorts' employment. If the speech was beyond the scope of their employment, then each of the alleged incidents would violate the Act's express terms. Petitioners' complaint would then be that the police were failing to *enforce* the Act equally against clinic escorts. Cf. *Hoye* v. *City of Oakland*, 653 F. 3d 835, 849–852 (CA9 2011) (finding selective enforcement of a similar ordinance in Oakland, California). While such allegations might state a claim of official viewpoint discrimination, that would not go to the validity of the Act. In any event, petitioners nowhere allege selective enforcement.

It would be a very different question if it turned out that a clinic authorized escorts to speak about abortion inside the buffer zones. See *post*, at 1–2 (ALITO, J., concurring in judgment). In that case, the escorts would not seem to be violating the Act because the speech would be within the scope of their employment.[3] The Act's exemption for clinic

———————

[3] Less than two weeks after the instant litigation was initiated, the Massachusetts Attorney General's Office issued a guidance letter clarifying the application of the four exemptions. The letter interpreted the exemptions as not permitting clinic employees or agents, municipal employees or agents, or individuals passing by clinics "to express their views about abortion or to engage in any other partisan speech within the buffer zone." App. 93, 93–94. While this interpretation supports our conclusion that the employee exemption does not render the Act viewpoint based, we do not consider it in our analysis because it appears to *broaden* the scope of the Act—a criminal statute—rather than to adopt a "'limiting construction.'" *Ward* v. *Rock Against Racism*, 491 U. S. 781, 796 (1989) (quoting *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 494, n. 5 (1982)).

employees would then facilitate speech on only one side of
the abortion debate—a clear form of viewpoint discrimina-
tion that would support an as-applied challenge to the
buffer zone at that clinic.  But the record before us con-
tains insufficient evidence to show that the exemption
operates in this way at any of the clinics, perhaps because
the clinics do not want to doom the Act by allowing their
employees to speak about abortion within the buffer
zones.[4]

We thus conclude that the Act is neither content nor
viewpoint based and therefore need not be analyzed under
strict scrutiny.

## IV

Even though the Act is content neutral, it still must be
"narrowly tailored to serve a significant governmental
interest."  *Ward*, 491 U. S., at 796 (internal quotation
marks omitted).  The tailoring requirement does not sim-
ply guard against an impermissible desire to censor.  The
government may attempt to suppress speech not only
because it disagrees with the message being expressed,
but also for mere convenience.  Where certain speech is
associated with particular problems, silencing the speech
is sometimes the path of least resistance.  But by demand-

———————

[4] Of course we do not hold that "[s]peech restrictions favoring one
viewpoint over another are not content based unless it can be shown
that the favored viewpoint has actually been expressed."  *Post*, at 13.
We instead apply an uncontroversial principle of constitutional adjudi-
cation: that a plaintiff generally cannot prevail on an *as-applied* chal-
lenge without showing that the law has in fact been (or is sufficiently
likely to be) unconstitutionally *applied* to him. Specifically, when
someone challenges a law as viewpoint discriminatory but it is not clear
from the face of the law which speakers will be allowed to speak, he
must show that he was prevented from speaking while someone espous-
ing another viewpoint was permitted to do so.  JUSTICE SCALIA can
decry this analysis as "astonishing" only by quoting a sentence that is
explicitly limited to as-applied challenges and treating it as relevant to
facial challenges.  *Ibid.*

ing a close fit between ends and means, the tailoring requirement prevents the government from too readily "sacrific[ing] speech for efficiency." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795 (1988).

For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U. S., at 799. Such a regulation, unlike a content-based restriction of speech, "need not be the least restrictive or least intrusive means of" serving the government's interests. *Id.,* at 798. But the government still "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.,* at 799.

## A

As noted, respondents claim that the Act promotes "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways." Brief for Respondents 27. Petitioners do not dispute the significance of these interests. We have, moreover, previously recognized the legitimacy of the government's interests in "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services." *Schenck* v. *Pro-Choice Network of Western N. Y.*, 519 U. S. 357, 376 (1997). See also *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 767–768 (1994). The buffer zones clearly serve these interests.

At the same time, the buffer zones impose serious burdens on petitioners' speech. At each of the three Planned Parenthood clinics where petitioners attempt to counsel patients, the zones carve out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways. The zones

thereby compromise petitioners' ability to initiate the close, personal conversations that they view as essential to "sidewalk counseling."

For example, in uncontradicted testimony, McCullen explained that she often cannot distinguish patients from passersby outside the Boston clinic in time to initiate a conversation before they enter the buffer zone. App. 135. And even when she does manage to begin a discussion outside the zone, she must stop abruptly at its painted border, which she believes causes her to appear "untrustworthy" or "suspicious." *Id.,* at 135, 152. Given these limitations, McCullen is often reduced to raising her voice at patients from outside the zone—a mode of communication sharply at odds with the compassionate message she wishes to convey. *Id.,* at 133, 152–153. Clark gave similar testimony about her experience at the Worcester clinic. *Id.,* at 243–244.

These burdens on petitioners' speech have clearly taken their toll. Although McCullen claims that she has persuaded about 80 women not to terminate their pregnancies since the 2007 amendment, App. to Pet. for Cert. 42a, she also says that she reaches "far fewer people" than she did before the amendment, App. 137. Zarrella reports an even more precipitous decline in her success rate: She estimated having about 100 successful interactions over the years before the 2007 amendment, but not a single one since. *Id.,* at 180. And as for the Worcester clinic, Clark testified that "only one woman out of 100 will make the effort to walk across [the street] to speak with [her]." *Id.,* at 217.

The buffer zones have also made it substantially more difficult for petitioners to distribute literature to arriving patients. As explained, because petitioners in Boston cannot readily identify patients before they enter the zone, they often cannot approach them in time to place literature near their hands—the most effective means of getting

the patients to accept it. *Id.,* at 179. In Worcester and Springfield, the zones have pushed petitioners so far back from the clinics' driveways that they can no longer even attempt to offer literature as drivers turn into the parking lots. *Id.,* at 213, 218, 252–253. In short, the Act operates to deprive petitioners of their two primary methods of communicating with patients.

The Court of Appeals and respondents are wrong to downplay these burdens on petitioners' speech. As the Court of Appeals saw it, the Constitution does not accord "special protection" to close conversations or "handbilling." 571 F. 3d, at 180. But while the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—such as normal conversation and leafletting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others.

In the context of petition campaigns, we have observed that "one-on-one communication" is "the most effective, fundamental, and perhaps economical avenue of political discourse." *Meyer* v. *Grant*, 486 U. S. 414, 424 (1988). See also *Schenck*, *supra*, at 377 (invalidating a "floating" buffer zone around people entering an abortion clinic partly on the ground that it prevented protestors "from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks"). And "handing out leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression"; "[n]o form of speech is entitled to greater constitutional protection." *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 347 (1995). See also *Schenck*, *supra*, at 377 ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment"). When the government makes it more difficult to engage in these modes of com-

munication, it imposes an especially significant First Amendment burden.[5]

Respondents also emphasize that the Act does not prevent petitioners from engaging in various forms of "protest"—such as chanting slogans and displaying signs—outside the buffer zones. Brief for Respondents 50–54. That misses the point. Petitioners are not protestors. They seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them. Petitioners believe that they can accomplish this objective only through personal, caring, consensual conversations. And for good reason: It is easier to ignore a strained voice or a waving hand than a direct greeting or an outstretched arm. While the record indicates that petitioners have been able to have a number of quiet conversations outside the buffer zones, respondents have not refuted petitioners' testimony that the conversations have been far less frequent and far less successful since the buffer zones were instituted. It is thus no answer to say that petitioners can still be "seen and heard" by women within the buffer zones. *Id.,* at 51–53. If all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message.

Finally, respondents suggest that, at the Worcester and Springfield clinics, petitioners are prevented from communicating with patients not by the buffer zones but by the fact that most patients arrive by car and park in the

———————

[5] As a leading historian has noted:

"It was in this form—as pamphlets—that much of the most important and characteristic writing of the American Revolution appeared. For the Revolutionary generation, as for its predecessors back to the early sixteenth century, the pamphlet had peculiar virtues as a medium of communication. Then, as now, it was seen that the pamphlet allowed one to do things that were not possible in any other form." B. Bailyn, The Ideological Origins of the American Revolution 2 (1967).

clinics' private lots. *Id.,* at 52. It is true that the layout of the two clinics would prevent petitioners from approaching the clinics' *doorways*, even without the buffer zones. But petitioners do not claim a right to trespass on the clinics' property. They instead claim a right to stand on the public sidewalks by the driveway as cars turn into the parking lot. Before the buffer zones, they could do so. Now they must stand a substantial distance away. The Act alone is responsible for that restriction on their ability to convey their message.

### B

### 1

The buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests. At the outset, we note that the Act is truly exceptional: Respondents and their *amici* identify no other State with a law that creates fixed buffer zones around abortion clinics.[6] That of course does not mean that the law is invalid. It does, however, raise concern that the Commonwealth has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage.

That is the case here. The Commonwealth's interests include ensuring public safety outside abortion clinics, preventing harassment and intimidation of patients and clinic staff, and combating deliberate obstruction of clinic entrances. The Act itself contains a separate provision, subsection (e)—unchallenged by petitioners—that prohibits much of this conduct. That provision subjects to criminal punishment "[a]ny person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry

---

[6]*Amici* do identify five localities with laws similar to the Act here. Brief for State of New York et al. as *Amici Curiae* 14, n. 7.

to or exit from a reproductive health care facility." Mass. Gen. Laws, ch. 266, §120E½(e).[7]  If Massachusetts determines that broader prohibitions along the same lines are necessary, it could enact legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (FACE Act), 18 U. S. C. §248(a)(1), which subjects to both criminal and civil penalties anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services."  Some dozen other States have done so.  See Brief for State of New York et al. as *Amici Curiae* 13, and n. 6.  If the Commonwealth is particularly concerned about harassment, it could also consider an ordinance such as the one adopted in New York City that not only prohibits obstructing access to a clinic, but also makes it a crime "to follow and harass another person within 15 feet of the premises of a reproductive health care facility."  N. Y. C. Admin. Code §8–803(a)(3) (2014).[8]

The Commonwealth points to a substantial public safety risk created when protestors obstruct driveways leading to the clinics.  See App. 18, 41, 51, 88–89, 99, 118–119.  That is, however, an example of its failure to look to less intru-

_____

[7]Massachusetts also has a separate law prohibiting similar kinds of conduct at any "medical facility," though that law, unlike the Act, requires explicit notice before any penalty may be imposed.  Mass. Gen. Laws, ch. 266, §120E.

[8]We do not "give [our] approval" to this or any of the other alternatives we discuss.  *Post*, at 4.  We merely suggest that a law like the New York City ordinance could in principle constitute a permissible alternative.  Whether such a law would pass constitutional muster would depend on a number of other factors, such as whether the term "harassment" had been authoritatively construed to avoid vagueness and overbreadth problems of the sort noted by JUSTICE SCALIA.

sive means of addressing its concerns. Any such obstruction can readily be addressed through existing local ordinances. See, *e.g.,* Worcester, Mass., Revised Ordinances of 2008, ch. 12, §25(b) ("No person shall stand, or place any obstruction of any kind, upon any street, sidewalk or crosswalk in such a manner as to obstruct a free passage for travelers thereon"); Boston, Mass., Municipal Code, ch. 16–41.2(d) (2013) ("No person shall solicit while walking on, standing on or going into any street or highway used for motor vehicle travel, or any area appurtenant thereto (including medians, shoulder areas, bicycle lanes, ramps and exit ramps)").

All of the foregoing measures are, of course, in addition to available generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like.

In addition, subsection (e) of the Act, the FACE Act, and the New York City anti-harassment ordinance are all enforceable not only through criminal prosecutions but also through public and private civil actions for injunctions and other equitable relief. See Mass. Gen. Laws §120E½(f); 18 U. S. C. §248(c)(1); N. Y. C. Admin. Code §§8–804, 8–805. We have previously noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures. Such an injunction "regulates the activities, and perhaps the speech, of a group," but only "because of the group's past *actions* in the context of a specific dispute between real parties." *Madsen*, 512 U. S., at 762 (emphasis added). Moreover, given the equitable nature of injunctive relief, courts can tailor a remedy to ensure that it restricts no more speech than necessary. See, *e.g., id.,* at 770; *Schenck*, 519 U. S., at 380–381. In short, injunctive relief focuses on the precise individuals and the precise conduct causing a particular problem. The Act, by contrast, categorically excludes nonexempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech.

The Commonwealth also asserts an interest in preventing congestion in front of abortion clinics. According to respondents, even when individuals do not deliberately obstruct access to clinics, they can inadvertently do so simply by gathering in large numbers. But the Commonwealth could address that problem through more targeted means. Some localities, for example, have ordinances that require crowds blocking a clinic entrance to disperse when ordered to do so by the police, and that forbid the individuals to reassemble within a certain distance of the clinic for a certain period. See Brief for State of New York et al. as *Amici Curiae* 14–15, and n. 10. We upheld a similar law forbidding three or more people "'to congregate within 500 feet of [a foreign embassy], and refuse to disperse after having been ordered so to do by the police,'" *Boos*, 485 U. S., at 316 (quoting D. C. Code §22–1115 (1938))—an order the police could give only when they "'reasonably believe[d] that a threat to the security or peace of the embassy [was] present,'" 485 U. S., at 330 (quoting *Finzer* v. *Barry*, 798 F. 2d 1450, 1471 (CADC 1986)).

And to the extent the Commonwealth argues that even these types of laws are ineffective, it has another problem. The portions of the record that respondents cite to support the anticongestion interest pertain mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings. App. 69–71, 88–89, 96, 123. Respondents point us to no evidence that individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access. For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution.

The point is not that Massachusetts must enact all or even any of the proposed measures discussed above. The point is instead that the Commonwealth has available to it a variety of approaches that appear capable of serving its

interests, without excluding individuals from areas historically open for speech and debate.

2

Respondents have but one reply: "We have tried other approaches, but they do not work." Respondents emphasize the history in Massachusetts of obstruction at abortion clinics, and the Commonwealth's allegedly failed attempts to combat such obstruction with injunctions and individual prosecutions. They also point to the Commonwealth's experience under the 2000 version of the Act, during which the police found it difficult to enforce the six-foot no-approach zones given the "frenetic" activity in front of clinic entrances. Brief for Respondents 43. According to respondents, this history shows that Massachusetts has tried less restrictive alternatives to the buffer zones, to no avail.

We cannot accept that contention. Although respondents claim that Massachusetts "tried other laws already on the books," *id.,* at 41, they identify not a single prosecution brought under those laws within at least the last 17 years. And while they also claim that the Commonwealth "tried injunctions," *ibid.*, the last injunctions they cite date to the 1990s, see *id.,* at 42 (citing *Planned Parenthood League of Mass., Inc.* v. *Bell*, 424 Mass. 573, 677 N. E. 2d 204 (1997); *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701, 550 N. E. 2d 1361 (1990)). In short, the Commonwealth has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor has it shown that it considered different methods that other jurisdictions have found effective.

Respondents contend that the alternatives we have discussed suffer from two defects: First, given the "widespread" nature of the problem, it is simply not "practicable" to rely on individual prosecutions and injunctions.

Brief for Respondents 45.  But far from being "wide-spread," the problem appears from the record to be limited principally to the Boston clinic on Saturday mornings. Moreover, by their own account, the police appear per-fectly capable of singling out lawbreakers.  The legislative testimony preceding the 2007 Act revealed substantial police and video monitoring at the clinics, especially when large gatherings were anticipated.  Captain Evans testi-fied that his officers are so familiar with the scene outside the Boston clinic that they "know all the players down there." App. 69.  And Attorney General Coakley relied on video surveillance to show legislators conduct she thought was "clearly against the law." *Id.,* at 78.  If Common-wealth officials can compile an extensive record of obstruc-tion and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law.

The second supposed defect in the alternatives we have identified is that laws like subsection (e) of the Act and the federal FACE Act require a showing of intentional or deliberate obstruction, intimidation, or harassment, which is often difficult to prove.  Brief for Respondents 45–47. As Captain Evans predicted in his legislative testimony, fixed buffer zones would "make our job so much easier." App. 68.

Of course they would.  But that is not enough to satisfy the First Amendment.  To meet the requirement of narrow tailoring, the government must demonstrate that alterna-tive measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.  A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.  In any case, we do not think that showing intentional obstruction is nearly so difficult in this context as respondents suggest.  To determine

whether a protestor intends to block access to a clinic, a police officer need only order him to move. If he refuses, then there is no question that his continued conduct is knowing or intentional.

For similar reasons, respondents' reliance on our decision in *Burson* v. *Freeman* is misplaced. There, we upheld a state statute that established 100-foot buffer zones outside polling places on election day within which no one could display or distribute campaign materials or solicit votes. 504 U. S.*,* at 193–194. We approved the buffer zones as a valid prophylactic measure, noting that existing "[i]ntimidation and interference laws fall short of serving a State's compelling interests because they 'deal with only the most blatant and specific attempts' to impede elections." *Id.,* at 206–207 (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 28 (1976) (*per curiam*)). Such laws were insufficient because "[v]oter intimidation and election fraud are . . . difficult to detect." *Burson*, 504 U. S., at 208. Obstruction of abortion clinics and harassment of patients, by contrast, are anything but subtle.

We also noted in *Burson* that under state law, "law enforcement officers generally are barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process," with the result that "many acts of interference would go undetected." *Id.,* at 207. Not so here. Again, the police maintain a significant presence outside Massachusetts abortion clinics. The buffer zones in *Burson* were justified because less restrictive measures were inadequate. Respondents have not shown that to be the case here.

Given the vital First Amendment interests at stake, it is not enough for Massachusetts simply to say that other approaches have not worked.[9]

––––––––––

[9] Because we find that the Act is not narrowly tailored, we need not consider whether the Act leaves open ample alternative channels of

\*　　\*　　\*

Petitioners wish to converse with their fellow citizens about an important subject on the public streets and sidewalks—sites that have hosted discussions about the issues of the day throughout history. Respondents assert undeniably significant interests in maintaining public safety on those same streets and sidewalks, as well as in preserving access to adjacent healthcare facilities. But here the Commonwealth has pursued those interests by the extreme step of closing a substantial portion of a traditional public forum to all speakers. It has done so without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes. The Commonwealth may not do that consistent with the First Amendment.

The judgment of the Court of Appeals for the First Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

communication. Nor need we consider petitioners' overbreadth challenge.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1168

_____

ELEANOR McCULLEN, ET AL., PETITIONERS *v.*
MARTHA COAKLEY, ATTORNEY GEN-
ERAL OF MASSACHUSETTS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 26, 2014]

JUSTICE SCALIA, with whom JUSTICE KENNEDY and
JUSTICE THOMAS join, concurring in the judgment.

Today's opinion carries forward this Court's practice of
giving abortion-rights advocates a pass when it comes to
suppressing the free-speech rights of their opponents.
There is an entirely separate, abridged edition of the First
Amendment applicable to speech against abortion. See,
*e.g.*, *Hill* v. *Colorado*, 530 U. S. 703 (2000); *Madsen* v.
*Women's Health Center, Inc.*, 512 U. S. 753 (1994).

The second half of the Court's analysis today, invalidat-
ing the law at issue because of inadequate "tailoring," is
certainly attractive to those of us who oppose an abortion-
speech edition of the First Amendment. But think again.
This is an opinion that has Something for Everyone, and
the more significant portion continues the onward march
of abortion-speech-only jurisprudence. That is the first
half of the Court's analysis, which concludes that a statute
of this sort is not content based and hence not subject to
so-called strict scrutiny. The Court reaches out to decide
that question unnecessarily—or at least unnecessarily
insofar as legal analysis is concerned.

I disagree with the Court's dicta (Part III) and hence see
no reason to opine on its holding (Part IV).

## I. The Court's Content-Neutrality Discussion
## Is Unnecessary

The gratuitous portion of today's opinion is Part III, which concludes—in seven pages of the purest dicta—that subsection (b) of the Massachusetts Reproductive Health Care Facilities Act is not specifically directed at speech opposing (or even concerning) abortion and hence need not meet the strict-scrutiny standard applicable to content-based speech regulations.[1]  Inasmuch as Part IV holds that the Act is unconstitutional because it does not survive the lesser level of scrutiny associated with content-neutral "time, place, and manner" regulations, there is no principled reason for the majority to decide whether the statute is subject to strict scrutiny.

Just a few months past, the Court found it unnecessary to "parse the differences between . . . two [available] standards" where a statute challenged on First Amendment grounds "fail[s] even under the [less demanding] test." *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. ___, ___ (2014) (plurality opinion) (slip op., at 10).  What has changed since then?  Quite simple: This is an abortion case, and *McCutcheon* was not.[2]  By engaging in constitutional dictum here (and reaching the wrong result), the

---

[1] To reiterate, the challenged provision states that "[n]o person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway" of such a facility or within an alternative rectangular area.  Mass. Gen. Laws, ch. 266, §120E½(b) (West 2012).  And the statute defines a "reproductive health care facility" as "a place, other than within or upon the grounds of a hospital, where abortions are offered or performed."  §120E½(a).

[2] The Court claims that *McCutcheon* declined to consider the more rigorous standard of review because applying it "would have required overruling a precedent."  *Ante*, at 11.  That hardly distinguishes the present case, since, as discussed later in text, the conclusion that this legislation escapes strict scrutiny does violence to a great swath of our First Amendment jurisprudence.

majority can preserve the ability of jurisdictions across the country to restrict antiabortion speech without fear of rigorous constitutional review. With a dart here and a pleat there, such regulations are sure to satisfy the tailoring standards applied in Part IV of the majority's opinion.

The Court cites two cases for the proposition that "[i]t is not unusual for the Court to proceed sequentially in applying a constitutional test, even when the preliminary steps turn out not to be dispositive." *Ante*, at 10–11 (citing *Bartnicki* v. *Vopper*, 532 U. S. 514, 526–527 (2001); *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 25–28 (2010)). Those cases provide little cover. In both, there was no disagreement among the Members of the Court about whether the statutes in question discriminated on the basis of content.[3] There was thus little harm in answering the constitutional question that was "logically antecedent." *Ante*, at 10. In the present case, however, content neutrality is far from clear (the Court is divided 5-to-4), and the parties vigorously dispute the point, see *ibid.* One would have thought that the Court would avoid the issue by simply assuming without deciding the logically antecedent point. We have done that often before. See, *e.g.*, *Herrera* v. *Collins*, 506 U. S. 390, 417 (1993); *Regents of Univ. of Mich.* v. *Ewing*, 474 U. S. 214, 222–223 (1985); *Board of Curators of Univ. of Mo.* v. *Horowitz*, 435 U. S. 78, 91–92 (1978).

The Court points out that its opinion goes on to suggest

––––––––––

[3] See *Bartnicki*, 532 U. S., at 526 ("We agree with petitioners that §2511(1)(c), as well as its Pennsylvania analog, is in fact a content-neutral law of general applicability"); *id.*, at 544 (Rehnquist, C. J., dissenting) ("The Court correctly observes that these are 'content-neutral law[s] of general applicability'" (brackets in original)); *Humanitarian Law Project*, 561 U. S., at 27 ("[Section] 2339B regulates speech on the basis of its content"); *id.*, at 45 (BREYER, J., dissenting) ("[W]here, as here, a statute applies criminal penalties and at least arguably does so on the basis of content-based distinctions, I should think we would scrutinize the statute and justifications 'strictly'").

(in Part IV) possible alternatives that apply only at abortion clinics, which therefore "raises the question whether those provisions are content neutral." *Ante*, at 11. Of course, the Court has no obligation to provide advice on alternative speech restrictions, and appending otherwise unnecessary constitutional pronouncements to such advice produces nothing but an impermissible advisory opinion.

By the way, there is dictum favorable to advocates of abortion rights even in Part IV. The Court invites Massachusetts, as a means of satisfying the tailoring requirement, to "consider an ordinance such as the one adopted in New York City that . . . makes it a crime 'to follow and harass another person within 15 feet of the premises of a reproductive health care facility.'" *Ante*, at 24 (quoting N. Y. C. Admin. Code §8–803(a)(3) (2014)). Is it harassment, one wonders, for Eleanor McCullen to ask a woman, quietly and politely, two times, whether she will take literature or whether she has any questions? Three times? Four times? It seems to me far from certain that First Amendment rights can be imperiled by threatening jail time (only at "reproductive health care facilit[ies]," of course) for so vague an offense as "follow[ing] and harass[ing]." It is wrong for the Court to give its approval to such legislation without benefit of briefing and argument.

## II. The Statute Is Content Based and Fails Strict Scrutiny

Having eagerly volunteered to take on the level-of-scrutiny question, the Court provides the wrong answer. Petitioners argue for two reasons that subsection (b) articulates a content-based speech restriction—and that we must therefore evaluate it through the lens of strict scrutiny.

### A. Application to Abortion Clinics Only

First, petitioners maintain that the Act targets abortion-related—for practical purposes, abortion-opposing—speech

because it applies outside abortion clinics only (rather than outside other buildings as well).

Public streets and sidewalks are traditional forums for speech on matters of public concern. Therefore, as the Court acknowledges, they hold a "'special position in terms of First Amendment protection.'" *Ante,* at 8 (quoting *United States* v. *Grace*, 461 U. S. 171, 180 (1983)). Moreover, "the public spaces outside of [abortion-providing] facilities . . . ha[ve] become, by necessity and by virtue of this Court's decisions, a forum of last resort for those who oppose abortion." *Hill*, 530 U. S., at 763 (SCALIA, J., dissenting). It blinks reality to say, as the majority does, that a blanket prohibition on the use of streets and sidewalks where speech on only one politically controversial topic is likely to occur—and where that speech can most effectively be communicated—is not content based. Would the Court exempt from strict scrutiny a law banning access to the streets and sidewalks surrounding the site of the Republican National Convention? Or those used annually to commemorate the 1965 Selma-to-Montgomery civil rights marches? Or those outside the Internal Revenue Service? Surely not.

The majority says, correctly enough, that a facially neutral speech restriction escapes strict scrutiny, even when it "may disproportionately affect speech on certain topics," so long as it is "justified without reference to the content of the regulated speech." *Ante*, at 12 (internal quotation marks omitted). But the cases in which the Court has previously found that standard satisfied—in particular, *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986), and *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), both of which the majority cites—are a far cry from what confronts us here.

*Renton* upheld a zoning ordinance prohibiting adult motion-picture theaters within 1,000 feet of residential neighborhoods, churches, parks, and schools. The ordi-

nance was content neutral, the Court held, because its purpose was not to suppress pornographic speech *qua* speech but, rather, to mitigate the "secondary effects" of adult theaters—including by "prevent[ing] crime, protect[ing] the city's retail trade, [and] maintain[ing] property values." 475 U. S., at 47, 48. The Court reasoned that if the city "'had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location.'" *Id.*, at 48 (quoting *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 82, n. 4 (1976) (Powell, J., concurring in part)). *Ward*, in turn, involved a New York City regulation requiring the use of the city's own sound equipment and technician for events at a bandshell in Central Park. The Court held the regulation content neutral because its "principal justification [was] the city's desire to control noise levels," a justification that "'ha[d] nothing to do with [the] content'" of respondent's rock concerts or of music more generally. 491 U. S., at 792. The regulation "ha[d] no material impact on any performer's ability to exercise complete artistic control over sound quality." *Id.*, at 802; see also *id.*, at 792–793.

Compare these cases' reasons for concluding that the regulations in question were "justified without reference to the content of the regulated speech" with the feeble reasons for the majority's adoption of that conclusion in the present case. The majority points only to the statute's stated purpose of increasing "'public safety'" at abortion clinics, *ante*, at 12–13 (quoting 2007 Mass. Acts p. 660), and to the additional aims articulated by respondents before this Court—namely, protecting "'patient access to healthcare . . . and the unobstructed use of public sidewalks and roadways,'" *ante,* at 13 (quoting Brief for Respondents 27). Really? Does a statute become "justified without reference to the content of the regulated speech" simply because the statute itself and those defending it in

court *say* that it is? Every objective indication shows that the provision's primary purpose is to restrict speech that opposes abortion.

I begin, as suggested above, with the fact that the Act burdens only the public spaces outside abortion clinics. One might have expected the majority to defend the statute's peculiar targeting by arguing that those locations regularly face the safety and access problems that it says the Act was designed to solve. But the majority does not make that argument because it would be untrue. As the Court belatedly discovers in Part IV of its opinion, although the statute applies to all abortion clinics in Massachusetts, only one is known to have been beset by the problems that the statute supposedly addresses. See *ante*, at 26, 28. The Court uses this striking fact (a smoking gun, so to speak) as a basis for concluding that the law is insufficiently "tailored" to safety and access concerns (Part IV) rather than as a basis for concluding that it is not *directed* to those concerns at all, but to the suppression of antiabortion speech. That is rather like invoking the eight missed human targets of a shooter who has killed one victim to prove, not that he is guilty of attempted mass murder, but that *he has bad aim*.

Whether the statute "restrict[s] more speech than necessary" in light of the problems that it allegedly addresses, *ante*, at 14–15, is, to be sure, relevant to the tailoring component of the First Amendment analysis (the shooter doubtless did have bad aim), but it is also relevant—powerfully relevant—to whether the law is really directed to safety and access concerns or rather to the suppression of a particular type of speech. Showing that a law that suppresses speech on a specific subject is so far-reaching that it applies even when the asserted non-speech-related problems are not present is persuasive evidence that the law is content based. In its zeal to treat abortion-related speech as a special category, the majority

distorts not only the First Amendment but also the ordinary logic of probative inferences.

The structure of the Act also indicates that it rests on content-based concerns. The goals of "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways," Brief for Respondents 27, are already achieved by an earlier-enacted subsection of the statute, which provides criminal penalties for "[a]ny person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility." §120E½(e). As the majority recognizes, that provision is easy to enforce. See *ante*, at 28–29. Thus, the speech-free zones carved out by subsection (b) add nothing to safety and access; what they achieve, and what they were obviously designed to achieve, is the suppression of speech opposing abortion.

Further contradicting the Court's fanciful defense of the Act is the fact that subsection (b) was enacted as a more easily enforceable substitute for a prior provision. That provision did not exclude people entirely from the restricted areas around abortion clinics; rather, it forbade people in those areas to approach within six feet of another person *without that person's consent* "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person." §120E½(b) (West 2000). As the majority acknowledges, that provision was "modeled on a . . . Colorado law that this Court had upheld in *Hill*." *Ante*, at 2. And in that case, the Court recognized that the statute in question was directed at the suppression of unwelcome speech, vindicating what *Hill* called "[t]he unwilling listener's interest in avoiding unwanted communication." 530 U. S., at 716. The Court held that interest to be content neutral. *Id.*, at 719–725.

The provision at issue here was indisputably meant to serve the same interest in protecting citizens' supposed

right to avoid speech that they would rather not hear. For that reason, we granted a second question for review in this case (though one would not know that from the Court's opinion, which fails to mention it): whether *Hill* should be cut back or cast aside. See Pet. for Cert. i. (stating second question presented as "If *Hill* . . . permits enforcement of this law, whether *Hill* should be limited or overruled"); 570 U. S. \_\_\_ (2013) (granting certiorari without reservation). The majority avoids that question by declaring the Act content neutral on other (entirely unpersuasive) grounds. In concluding that the statute is content based and therefore subject to strict scrutiny, I necessarily conclude that *Hill* should be overruled. Reasons for doing so are set forth in the dissents in that case, see 530 U. S., at 741–765 (SCALIA, J.); *id.*, at 765–790 (KENNEDY, J.), and in the abundance of scathing academic commentary describing how *Hill* stands in contradiction to our First Amendment jurisprudence.[4] Protecting people from speech they do not want to hear is not a function that the First Amendment allows the government to undertake in the public streets and sidewalks.

One final thought regarding *Hill*: It can be argued, and it should be argued in the next case, that by stating that "the Act would not be content neutral if it were concerned with undesirable effects that arise from . . . '[l]isteners' reactions to speech,'" *ante*, at 13 (quoting *Boos* v. *Barry*, 485 U. S. 312, 321 (1988) (brackets in original)), and then holding the Act unconstitutional for being insufficiently tailored to safety and access concerns, the Court itself has

---

[4] "*Hill* . . . is inexplicable on standard free-speech grounds[,] and . . . it is shameful the Supreme Court would have upheld this piece of legislation on the reasoning that it gave." Constitutional Law Symposium, Professor Michael W. McConnell's Response, 28 Pepperdine L. Rev. 747 (2001). "I don't think [*Hill*] was a difficult case. I think it was slam-dunk simple and slam-dunk wrong." *Id.*, at 750 (remarks of Laurence Tribe). The list could go on.

*sub silentio* (and perhaps inadvertently) overruled *Hill.*
The unavoidable implication of that holding is that protec-
tion against unwelcome speech cannot justify restrictions
on the use of public streets and sidewalks.

B. Exemption for Abortion-Clinic Employees or Agents

Petitioners contend that the Act targets speech opposing
abortion (and thus constitutes a presumptively invalid
viewpoint-discriminatory restriction) for another reason
as well: It exempts "employees or agents" of an abortion
clinic "acting within the scope of their employment,"
§120E½(b)(2).

It goes without saying that "[g]ranting waivers to fa-
vored speakers (or . . . denying them to disfavored speak-
ers) would of course be unconstitutional." *Thomas* v.
*Chicago Park Dist.*, 534 U. S. 316, 325 (2002). The major-
ity opinion sets forth a two-part inquiry for assessing
whether a regulation is content based, but when it comes
to assessing the exemption for abortion-clinic employees or
agents, the Court forgets its own teaching. Its opinion
jumps right over the prong that asks whether the provi-
sion "draw[s] . . . distinctions on its face," *ante*, at 12, and
instead proceeds directly to the purpose-related prong, see
*ibid.,* asking whether the exemption "represent[s] a gov-
ernmental attempt to give one side of a debatable public
question an advantage in expressing its views to the peo-
ple," *ante*, at 15 (internal quotation marks omitted). I
disagree with the majority's negative answer to that ques-
tion, but that is beside the point if the text of the statute—
whatever its purposes might have been—"license[s] one
side of a debate to fight freestyle, while requiring the other
to follow Marquis of Queensberry rules." *R. A. V.* v. *St.
Paul*, 505 U. S. 377, 392 (1992).

Is there any serious doubt that *abortion-clinic employees
or agents* "acting within the scope of their employment"
near clinic entrances may—indeed, often will—speak in

favor of abortion ("You are doing the right thing")? Or speak in opposition to the message of abortion opponents—saying, for example, that "this is a safe facility" to rebut the statement that it is not? See Tr. of Oral Arg. 37–38. The Court's contrary assumption is simply incredible. And the majority makes no attempt to establish the further necessary proposition that abortion-clinic employees and agents do not engage in nonspeech activities directed to the suppression of antiabortion speech by hampering the efforts of counselors to speak to prospective clients. Are we to believe that a clinic employee sent out to "escort" prospective clients into the building would not seek to prevent a counselor like Eleanor McCullen from communicating with them? He could pull a woman away from an approaching counselor, cover her ears, or make loud noises to drown out the counselor's pleas.

The Court points out that the exemption may allow into the speech-free zones clinic employees other than escorts, such as "the maintenance worker shoveling a snowy sidewalk or the security guard patrolling a clinic entrance." *Ante*, at 16. I doubt that Massachusetts legislators had those people in mind, but whether they did is in any event irrelevant. Whatever other activity is permitted, so long as the statute permits speech favorable to abortion rights while excluding antiabortion speech, it discriminates on the basis of viewpoint.

The Court takes the peculiar view that, so long as the clinics have not specifically authorized their employees to speak in favor of abortion (or, presumably, to impede antiabortion speech), there is no viewpoint discrimination. See *ibid.* But it is axiomatic that "where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country[,] they are presumed to have been used in that sense unless the context compels to the contrary." *Standard Oil Co. of N. J.* v. *United States*, 221 U. S. 1, 59 (1911). The phrase

"scope of employment" is a well-known common-law con-
cept that includes "[t]he range of reasonable and foresee-
able activities that an employee engages in while carrying
out the employer's business."  Black's Law Dictionary 1465
(9th ed. 2009).  The employer need not specifically direct
or sanction each aspect of an employee's conduct for it to
qualify.  See Restatement (Second) of Agency §229 (1957);
see also Restatement (Third) of Agency §7.07(2), and
Comment *b* (2005).  Indeed, employee conduct can qualify
even if the employer specifically forbids it.  See Restate-
ment (Second) §230.  In any case, it is implausible that
clinics would bar escorts from engaging in the sort of
activity mentioned above.  Moreover, a statute that forbids
one side but not the other to convey its message does not
become viewpoint neutral simply because the favored side
chooses voluntarily to abstain from activity that the stat-
ute permits.

There is not a shadow of a doubt that the assigned or
foreseeable conduct of a clinic employee or agent can
include both speaking in favor of abortion rights and
countering the speech of people like petitioners.  See *post*,
at 1–2 (ALITO, J., concurring in judgment).  Indeed, as the
majority acknowledges, the trial record includes testimony
that escorts at the Boston clinic "expressed views about
abortion to the women they were accompanying, thwarted
petitioners' attempts to speak and hand literature to the
women, and disparaged petitioners in various ways,"
including by calling them "'crazy.'"  *Ante*, at 7, 16
(citing App. 165, 168–169, 177–178, 189–190).  What a
surprise!  The Web site for the Planned Parenthood
League of Massachusetts (which operates the three
abortion facilities where petitioners attempt to counsel
women), urges readers to "Become a Clinic Escort Vol-
unteer" in order to "provide a safe space for patients
by escorting them through protestors to the health center."
Volunteer and Internship Opportunities, online at https://

plannedparenthoodvolunteer.hire.com/viewjob.html?optlink-view=view-28592&ERFormID=newjoblist&ERFormCode=any (as visited June 24, 2014, and available in Clerk of Court's case file). The dangers that the Web site attributes to "protestors" are related entirely to speech, not to safety or access. "Protestors," it reports, "hold signs, try to speak to patients entering the building, and distribute literature that can be misleading." *Ibid.* The "safe space" provided by escorts is protection from that speech.

Going from bad to worse, the majority's opinion contends that "the record before us contains insufficient evidence to show" that abortion-facility escorts have actually spoken in favor of abortion (or, presumably, hindered antiabortion speech) while acting within the scope of their employment. *Ante*, at 18. Here is a brave new First Amendment test: Speech restrictions favoring one viewpoint over another are not content based unless it can be shown that the favored viewpoint has actually been expressed. A city ordinance closing a park adjoining the Republican National Convention to all speakers except those whose remarks have been approved by the Republican National Committee is thus not subject to strict scrutiny unless it can be shown that someone has given committee-endorsed remarks. For this Court to suggest such a test is astonishing.[5]

———————

[5] The Court states that I can make this assertion "only by quoting a sentence that is explicitly limited to as-applied challenges and treating it as relevant to facial challenges." *Ante*, at 18, n. 4. That is not so. The sentence in question appears in a paragraph immediately following rejection of the facial challenge, which begins: "It would be a very different question if it turned out that a clinic authorized escorts to speak about abortion inside the buffer zones." *Ante*, at 17. And the prior discussion regarding the facial challenge points to the fact that "[t]here is no suggestion in the record that any of the clinics authorize their employees to speak about abortion in the buffer zones." *Ante*, at 16. To be sure, the paragraph in question then goes on to concede only that the statute's constitutionality *as applied* would depend upon

### C. Conclusion

In sum, the Act should be reviewed under the strict-scrutiny standard applicable to content-based legislation. That standard requires that a regulation represent "the least restrictive means" of furthering "a compelling Government interest." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000) (internal quotation marks omitted). Respondents do not even attempt to argue that subsection (b) survives this test. See *ante*, at 10. "Suffice it to say that if protecting people from unwelcome communications"—the actual purpose of the provision—"is a compelling state interest, the First Amendment is a dead letter." *Hill*, 530 U. S., at 748–749 (Scalia, J., dissenting).

### III. Narrow Tailoring

Having determined that the Act is content based and does not withstand strict scrutiny, I need not pursue the inquiry conducted in Part IV of the Court's opinion— whether the statute is "'narrowly tailored to serve a significant governmental interest,'" *ante*, at 18 (quoting *Ward*, 491 U. S., at 796 (internal quotation marks omitted)). I suppose I *could* do so, taking as a given the Court's erroneous content-neutrality conclusion in Part III; and if I did, I suspect I would agree with the majority that the legislation is not narrowly tailored to advance the interests asserted by respondents. But I prefer not to take part in the assembling of an apparent but specious unanimity. I leave both the plainly unnecessary and erroneous half

_____

explicit clinic authorization. Even that seems to me wrong. Saying that voluntary action by a third party can cause an otherwise valid statute to violate the First Amendment as applied seems to me little better than saying it can cause such a statute to violate the First Amendment facially. A statute that punishes me for speaking unless *x* chooses to speak is unconstitutional facially and as applied, without reference to *x*'s action.

and the arguably correct half of the Court's analysis to the majority.

\*      \*      \*

The obvious purpose of the challenged portion of the Massachusetts Reproductive Health Care Facilities Act is to "protect" prospective clients of abortion clinics from having to hear abortion-opposing speech on public streets and sidewalks. The provision is thus unconstitutional root and branch and cannot be saved, as the majority suggests, by limiting its application to the single facility that has experienced the safety and access problems to which it is quite obviously not addressed. I concur only in the judgment that the statute is unconstitutional under the First Amendment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1168

_____

ELEANOR McCULLEN, ET AL., PETITIONERS *v.*
MARTHA COAKLEY, ATTORNEY GEN-
ERAL OF MASSACHUSETTS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 26, 2014]

JUSTICE ALITO, concurring in the judgment.

I agree that the Massachusetts statute at issue in this case, Mass. Gen. Laws, ch. 266, §120E½(b) (West 2012), violates the First Amendment. As the Court recognizes, if the Massachusetts law discriminates on the basis of viewpoint, it is unconstitutional, see *ante,* at 10, and I believe the law clearly discriminates on this ground.

The Massachusetts statute generally prohibits any person from entering a buffer zone around an abortion clinic during the clinic's business hours, §120E½(c), but the law contains an exemption for "employees or agents of such facility acting within the scope of their employment." §120E½(b)(2). Thus, during business hours, individuals who wish to counsel against abortion or to criticize the particular clinic may not do so within the buffer zone. If they engage in such conduct, they commit a crime. See §120E½(d). By contrast, employees and agents of the clinic may enter the zone and engage in any conduct that falls within the scope of their employment. A clinic may direct or authorize an employee or agent, while within the zone, to express favorable views about abortion or the clinic, and if the employee exercises that authority, the employee's conduct is perfectly lawful. In short, petitioners and other critics of a clinic are silenced, while the

clinic may authorize its employees to express speech in support of the clinic and its work.

Consider this entirely realistic situation. A woman enters a buffer zone and heads haltingly toward the entrance. A sidewalk counselor, such as petitioners, enters the buffer zone, approaches the woman and says, "If you have doubts about an abortion, let me try to answer any questions you may have. The clinic will not give you good information." At the same time, a clinic employee, as instructed by the management, approaches the same woman and says, "Come inside and we will give you honest answers to all your questions." The sidewalk counselor and the clinic employee expressed opposing viewpoints, but only the first violated the statute.

Or suppose that the issue is not abortion but the safety of a particular facility. Suppose that there was a recent report of a botched abortion at the clinic. A nonemployee may not enter the buffer zone to warn about the clinic's health record, but an employee may enter and tell prospective clients that the clinic is safe.

It is clear on the face of the Massachusetts law that it discriminates based on viewpoint. Speech in favor of the clinic and its work by employees and agents is permitted; speech criticizing the clinic and its work is a crime. This is blatant viewpoint discrimination.

The Court holds not only that the Massachusetts law is viewpoint neutral but also that it does not discriminate based on content. See *ante,* at 11–15. The Court treats the Massachusetts law like one that bans all speech within the buffer zone. While such a law would be content neutral on its face, there are circumstances in which a law forbidding all speech at a particular location would not be content neutral in fact. Suppose, for example, that a facially content-neutral law is enacted for the purpose of suppressing speech on a particular topic. Such a law would not be content neutral. See, *e.g., Turner Broadcast-*

*ing System, Inc.* v. *FCC*, 512 U. S. 622, 645–646 (1994).

In this case, I do not think that it is possible to reach a judgment about the intent of the Massachusetts Legislature without taking into account the fact that the law that the legislature enacted blatantly discriminates based on viewpoint. In light of this feature, as well as the overbreadth that the Court identifies, see *ante,* at 23–27, it cannot be said, based on the present record, that the law would be content neutral even if the exemption for clinic employees and agents were excised. However, if the law were truly content neutral, I would agree with the Court that the law would still be unconstitutional on the ground that it burdens more speech than is necessary to serve the Commonwealth's asserted interests.